IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | |
|---|---|
| **MARK CARVER,** *Plaintiff,* v. **CITY OF MOUNT HOLLY; ANDREA WILLIAMS as executor for the ESTATE OF KAREN WINNINGHAM; KRISTIN HUGHES; DAVID CROW; WILLIAM TERRY; WILLIAM STETZER; KEVIN MURPHY and JIM WORKMAN,** *Defendants.* | 5:25 CV 478 **COMPLAINT** **(Jury trial demanded)** |

## INTRODUCTION

1. Mark Carver was convicted of a murder he did not commit. His conviction and sentence were ultimately vacated, and the charges against him were subsequently dismissed.

2. Mark Carver is an intellectually disabled man with severe physical disabilities. He would not have been physically able to commit the murder, nor did he have the mental acuity to properly explain himself when, despite his obvious intellectual challenges, the State manipulated him during his interviews.

3. The evidence against Carver was weak and barely circumstantial. He was arrested for murder because of his proximity to the crime scene when fishing, the State's claim that he described the victim in a statement to detectives, and the State's claim that his DNA was on and in the victim's car.

4. The State's evidence was fabricated, misleading, and used in reckless disregard of the Plaintiff's constitutional rights. The "proximity" to the crime scene was not as the State claimed. The "statement" to the detectives was clearly the product of leading questions which ignored Carver's clear intellectual disability. The DNA evidence was faulty and would not have been used against Carver without North

Carolina State Bureau of Investigation's Crime Lab leadership and staff acting in reckless disregard of national standards for the interpretation of DNA mixture evidence.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1367, and 42 U.S.C. § 1983.

6. 28 U.S.C. § 1391(b)(1) allows an action to be brought in the district in which any defendant resides, as long as all defendants reside within the State in which that district is located. Several Defendants in this action are located within the Eastern District of North Carolina; therefore, this is the proper venue for this action.

## PARTIES

7. Plaintiff Mark Carver is a resident of Gaston County, North Carolina.

8. Defendant Andrea Williams is the executor of the estate of the deceased Karen Winningham. Winningham, at the times described in this Complaint, was an employee of the North Carolina State Bureau of Investigation Crime Lab[1], located in Wake County, North Carolina.

9. Defendant Kristin Hughes, at the times described in this Complaint, was an employee of the North Carolina State Bureau of Investigation Crime Lab (SBI Crime Lab), located in Wake County, North Carolina.

10. Defendant David Crow, at the times described in this Complaint, was an agent of the North Carolina State Bureau of Investigation (SBI), located in Wake County, North Carolina.

11. Defendant William Terry, at the times described in this Complaint, was a detective with the Mount Holly Police Department, located in Gaston County, North Carolina.

---

[1] Now known as the North Carolina State Crime Laboratory.

12. Defendant William Stetzer, at the times described in this Complaint, was an Assistant District Attorney in the Gaston County District Attorney's Office in Gaston County, North Carolina. He is specifically being sued for his role in investigating this matter.

13. Defendant Kevin Murphy, at the times described in this Complaint, was a law enforcement officer with the Gaston County Police Department, located in Gaston County, North Carolina.

14. Defendant Jim Workman, at the times described in this Complaint, was a crime scene technician for the Gaston County Police Department, located in Gaston County, North Carolina.

15. Defendant City of Mount Holly is a local government entity located in Gaston County, North Carolina.

## FACTS

### Discovery of the Body

16. On May 5, 2008, two jet skiers discovered a woman's body on an embankment of the Catawba River.

17. At 1:07 p.m., a 911 call was received by the Gaston County Communications Center.

18. At 1:12 p.m., officers with the Belmont Police Department (BPD) were dispatched to the scene.

19. At 1:20 p.m., officers with the Mount Holly Police Department (MHPD) were dispatched.

20. Upon arrival, investigators determined that the body was Ms. Yarmolenko, a student at the University of North Carolina at Charlotte (UNC-C).

21. Ms. Yarmolenko's body was found next to her car on the embankment. Her feet were pointing toward the river, and her hand was gripping a vine.

22. Both driver-side doors of Ms. Yarmolenko's car were open, the car had struck a

23. tree stump just above the waterline of the river, and the front right tire was in a mud puddle.

23. The car was in neutral. According to the State's report, the driver's seat belt was buckled at the time of impact, and the car was traveling approximately 10–15 miles per hour when it hit the tree stump. The engine was not running.

24. The car keys were found on the ground near the rear of the driver's side of the vehicle.

25. Ms. Yarmolenko had been strangled to death with three ligatures that came from within her vehicle—a black drawstring that was consistent with having come from her hooded sweatshirt, a blue ribbon that matched ribbon found on a bag discovered in her car, and a blue bungee cord that was similar to another bungee cord located in the trunk of her car.

### Ms. Yarmolenko's activities on the day of the murder

26. Ms. Yarmolenko's whereabouts in the hours prior to her murder are well documented.

27. At 10:17 a.m., Ms. Yarmolenko, as evidenced by surveillance video, stopped at her bank in Charlotte to make a deposit.

28. At 10:33 a.m., she dropped off donations at Goodwill in Charlotte. This was also captured on surveillance video.

29. Around 10:50 a.m., she stopped by a coffee shop where she worked near the UNC-C campus. She was not working the day of her murder.

30. At 11:09 a.m., surveillance video shows her car entering the parking lot of a YMCA in Belmont, NC. It circles the parking lot and exits at 11:10 a.m. and appears to go towards the Water's Edge Subdivision. The video is not clear enough to determine who is driving or how many people are in the car.

31. The embankment where she was murdered is located next to the Water's Edge Subdivision.

32. Based upon the video surveillance, Ms. Yarmolenko was murdered sometime between 11:10 a.m. and 1:07 p.m. when the first 911 call was placed.

33. Why Ms. Yarmolenko was in the Belmont area, roughly twenty minutes from her apartment and university, has never been confirmed. There is no known previous connection between Ms. Yarmolenko and the YMCA, the Water's Edge Subdivision, or the embankment where she was found.

### The Law Enforcement Investigation

34. When officers arrived at the crime scene, both of the driver side doors were open. They were still open when the lead MHPD detective, William Terry (Det. Terry), arrived around 2:15 p.m. At some point during the crime scene investigation, but before the car was tested, photos taken by law enforcement document that the doors were closed.

35. Investigators failed to interview or request DNA samples from any of the nearby construction workers.

36. A half-eaten chicken wrap from Wendy's was found in her trunk.

37. A camera was also found in her trunk. There was no film in it, but two exposures were shown on the counter.

38. Detective Jim Workman (Det. Workman) with the Gaston County Police Department (GCPD) collected latent prints from the outside of the car at the scene, but none of the latent prints recovered were reported as being of value for identification purposes.

39. Law enforcement did not keep a crime scene log, despite it being standard practice.

40. That evening, the car was removed from the scene and taken to the BPD's secure garage.

41. On May 6, 2008, the autopsy was performed. (Trial Tr. 313.) The report concluded Ms. Yarmolenko died from asphyxiation secondary to ligature strangulation.

42. On May 7, 2008, Officer J.D. Costner (Ofc. Costner) with the GCPD processed the interior of Ms. Yarmolenko's car and items found in the car for latent prints. He

also packaged items for possible DNA testing.

43. None of the prints recovered by Ofc. Costner were reported as having value for identification purposes.

44. On July 10, 2008, two months after the murder, Det. Workman finally swabbed the car for DNA.

45. Det. Workman did not swab the gear shift, the ignition switch, or the steering wheel for DNA.

46. In the days following the murder, investigators spoke with Ms. Yarmolenko's friends and classmates. One indicated she was a very trusting person who was known to pick up hitchhikers and often walked through the woods alone.

47. On June 11, 2008, Trooper Daniel Souther (Tpr. Souther), a collision reconstructionist with the State Highway Patrol, was asked to perform an inspection of Ms. Yarmolenko's car.

48. Two weeks later, Tpr. Souther performed the inspection. He specifically examined the airbag data and determined that, given the extent of damage to the car upon hitting the tree stump, the airbag should have deployed. Since it did not, he testified that in his opinion the car was turned off when it hit the stump.

49. Tpr. Souther also determined that the car had been traveling at about 10–15 miles per hour at the time of impact and that the driver's seat belt was buckled at the time of impact.

50. As confirmed by photos taken during his examination, Tpr. Souther did not wear gloves when he inspected the car. He testified that he had been told the car had already been processed for DNA. Although items from the car had been previously collected, the car itself had not been processed and was not processed until a month later.

51. Police interviewed Ms. Yarmolenko's friends and family and learned she was a very trusting person who often picked up hitchhikers and walked through the woods alone.

## Investigation into Mark Carver

52. On the morning of May 5, 2008, Plaintiff Mark Carver picked up a salt block for his cousin's goats. An employee put the salt block in Plaintiff's vehicle because Carver could not carry heavy objects.

53. Plaintiff dropped off a prescription at the College Park Pharmacy, and it was filled at 10:52 a.m.

54. Plaintiff Carver left the pharmacy and went fishing on the Catawba River.

55. Plaintiff's cousin, Neal Cassada, met him at the river to pick up the salt block.

56. It took both men to move the salt block from Plaintiff's vehicle.

57. Plaintiff suffered from carpal tunnel syndrome since 1998 and received disability payments for this condition prior to his wrongful conviction and wrongful incarceration in this case.

58. Cassada had two previous heart attacks and suffered significant cardiac issues.[2]

59. Cassada left the fishing spot between 12:00 p.m. and 1:00 p.m., and Plaintiff continued to fish by himself.

60. Around 2:15 p.m., Officer Robert Ellison of the Mount Holly Police Department approached Plaintiff, who was still fishing in the same spot he had been at for several hours.

61. Plaintiff provided his identification to Officer Ellison. Plaintiff also informed Ellison that Cassada had been with him earlier and provided Cassada's contact information.

62. Plaintiff left around 2:30 p.m. to pick up his daughter from school.

63. After leaving the fishing spot, Plaintiff went to the pharmacy to pick up his prescription. The murder was on the TV in the pharmacy, and Plaintiff remarked he had been fishing near where the crime occurred, and law enforcement told him

---

[2] Cassada died from a heart attack the night before his trial.

someone had been shot.

64. Plaintiff realized he had left his fishing net at the fishing spot and went back to retrieve it. Officers were removing Ms. Yarmolenko's car from the embankment, and Plaintiff was not allowed to retrieve the fishing net.

65. Plaintiff went back to the fishing spot the following morning to retrieve his net, but it was gone.

66. On May 15, 2008, Plaintiff voluntarily gave a statement to the investigators. He told them he and Cassada had been at the river the day of the murder to fish.

67. Plaintiff and Cassada voluntarily provided buccal swabs and fingerprints to law enforcement on October 6, 2008.

68. Cassada was interrogated by police on video. He denied touching Ms. Yarmolenko's car. When police lied to him and told him Plaintiff was implicating him in the crime, he maintained his innocence and denied any involvement with the crime or ever seeing or being near Ms. Yarmolenko's car.

69. Plaintiff Carver is illiterate and did not complete high school. Prison evaluations reflected that his reading and spelling skills at the time of his incarceration were at a first-grade level. He has a very low IQ.

70. In addition to intellectual limitations, Plaintiff has significant physical disabilities.

71. Plaintiff suffers from both carpal tunnel syndrome and radial tunnel syndrome, leaving him physically disabled. Plaintiff's physical limitations would have prevented him from committing this crime.

72. Law enforcement began to concentrate on Plaintiff as a suspect in Ms. Yarmolenko's murder, despite no motive and no physical ability to commit the crime.

73. On October 6, 2008, Defendant Crow interviewed Plaintiff, and Plaintiff voluntarily gave a DNA sample to Defendants Crow and Terry.

74. Plaintiff explained to Defendants Crow and Terry that he always fishes at the area on the river where he was on the day of the crime.

75. Plaintiff described his actions on the day of the murder, which were consistent with the actions described earlier in this Complaint.

76. During his interrogations, Carver mentions that he has carpal tunnel and tendonitis in his arms.

77. Plaintiff denied any involvement in Yarmolenko's death and did not know who killed her. The interview with Defendants Crow and Terry ended.

### DNA Testing

78. After the October interview with Plaintiff, Defendant Crow sent Plaintiff's DNA sample to the SBI lab for analysis.

79. Testing and interpretation of the relevant items was conducted by Winningham and Defendant Hughes, DNA analysts at the SBI Lab.

80. The critical (and only) relevant DNA evidence against Carver was a swab from the pillar above the driver's side rear door.

81. The DNA sample sent to the SBI Lab was a low-quality sample. Four of the markers had no allelic peaks. Due to stochastic effect, allelic dropout should have been assumed at all 15 autosomal markers. Based on missing data and manipulation of testing to reach a certain result, the DNA results should not have been reported as a "match" to Plaintiff.

82. Despite the flaws in the DNA data, the SBI Lab analysts reached the incorrect conclusion that the DNA profile was a mixture with a predominant profile that matched Plaintiff.

83. To support its faulty conclusion, the SBI lab analysts failed to use specific markers in their statistical calculations to avoid Carver's exclusion from the sample.

84. Another DNA sample was similarly manipulated so the SBI Lab analysts could claim they "could not exclude Mark Carver" from the sample.

85. This second sample was not of sufficient quality to report a conclusion but was used to support the case against Carver.

86. These faulty DNA results were provided to the Mount Holly Police Department on December 10, 2008.

87. There were a number of other items from the crime scene that contained DNA but were not a match to Carver.

### December Interrogations and Arrests

88. On December 10, 2008, Plaintiff was interviewed by Defendants Terry and Crow.

89. Plaintiff suffers obvious and significant intellectual disabilities.

90. Plaintiff is easily manipulated and clearly mimicked Defendant Crow during the interrogation.

91. Defendant Crow used this mimicking to falsely claim that Plaintiff had knowledge of the victim's size. In reality, Plaintiff simply repeated what the interrogators told him and showed him.

92. On December 12, 2008, Carver was arrested and interrogated by Defendant Crow.

93. Defendant Crow told Carver he knew he had murdered Ms. Yarmolenko and had been in the car.

94. Plaintiff Carver told Defendant Crow he did not have the physical strength to commit a murder.

95. Defendant Crow immediately began misrepresenting Plaintiff's statements during the interrogation in an attempt to manipulate his statement.

96. Defendant Crow threatened Plaintiff with death by the electric chair during his statement.

97. Defendant Crow repeatedly accused Plaintiff of lying without any basis.

98. Plaintiff repeatedly denied his presence at the crime scene and denied any involvement with the murder, even in the face of alleged DNA evidence and lies by law enforcement related to their knowledge of the crime.

### Information related to possible alternative suspects

99. After Carver was convicted, information became available regarding a witness who

would have been critical for Plaintiff Carver's defense.

100. Carol Ingle told Defendant Kevin Murphy with the Gaston County Police Department that she was driving on Highway 273 near the crime scene on the day of Ms. Yarmolenko's murder.

101. Around 11:00 a.m., she saw a car similar to Ms. Yarmolenko's car travelling at a high rate of speed and saw it turn onto the road that leads to the YMCA in Mount Holly.

102. Ms. Ingle saw a young white male driving the car. She described him as approximately 5' 10" with a stocky build and medium brown hair.

103. Ms. Ingle was returning home around half an hour later on the same road and saw the same young man walking along the road.

104. Ms. Ingle saw both Plaintiff and Cassada in the news and neither of them were the man she saw driving the car and then walking down the road.

105. Ms. Ingle relayed this information to law enforcement who did not turn this information over to Plaintiff.

106. Another witness, Angel Beatty, lived near the crime scene and was interviewed by a Mount Holly Police Department officer.

107. Ms. Beatty told the police she saw a black male running from the direction of the crime scene who was soaking wet and carrying a book bag.

108. The Mount Holly Police Department never disclosed this information to Plaintiff.

## Other matters related to the investigation

109. Defendant Terry, during the investigation, claimed to have conducted an experiment in which he determined that the distance between where Plaintiff was fishing and where the victim's body was found was so close that a person in one spot could hear a person in the other spot speaking at a normal volume.

110. The claim from the investigation regarding sound traveling between the crime scene and the Plaintiff's fishing spot was false.

111. Defendant Stetzer also conducted an experiment of his own to determine if sound could travel between the crime scene and Plaintiff's fishing spot, and was aware that the claim that sound could be heard between the two spots was false.

112. Evidence of proximity to the crime scene was manipulated to implicate Plaintiff Mark Carver.

113. Defendant Workman possessed exculpatory fingerprint evidence and failed to disclose and/or pursue that exculpatory evidence.

114. After the DNA results from the SBI Lab analysts, there was no further investigation into any other suspects.

115. DNA evidence was manipulated to cast blame on Plaintiff, despite the reckless and faulty interpretation of the evidence.

116. The alleged admissions by Plaintiff were not admissions at all, and Defendants Crow and Terry were aware of this.

117. Defendants misrepresented evidence, disregarded evidence, and manipulated evidence in reckless disregard of Plaintiff's rights to manufacture the case for arrest against Plaintiff.

118. Plaintiff was convicted and spent nearly ten years in prison for the murder of Ms. Yarmalenko, a crime he did not commit.

119. Plaintiff, represented by the North Carolina Center on Actual Innocence, filed a Motion for Appropriate Relief.

120. Plaintiff's conviction was vacated by a judge of the North Carolina Superior Court.

121. The State appealed the ruling of the Superior Court, and that appeal was ultimately dismissed by the North Carolina Court of Appeals.

122. Despite the lack of credible evidence against Plaintiff and the rulings from both the Superior Court and the Court of Appeals, the Gaston County District Attorney expressed his intention to continue the attempt to convict Plaintiff for a crime he did not commit.

123. On August 12, 2022, a newly elected District Attorney in Gaston County finally

-12-

Case 5:25-cv-00478-M-BM     Document 1     Filed 08/08/25     Page 12 of 20

dismissed the charges against Plaintiff.

## FOR A FIRST CAUSE OF ACTION

## (42 U.S.C. § 1983 claim pursuant to the Due Process Clause of the 14th Amendment for misrepresentation of evidence against Defendant Williams as Administrator for the Estate of Winningham and Defendant Hughes)

124. Defendants Hughes and Winningham, at the times relevant to this Complaint, were forensic analysts at the SBI Lab and tasked with DNA analysis.

125. Winningham and Hughes intentionally or with reckless disregard for Plaintiff's constitutional rights misrepresented DNA evidence against Plaintiff.

126. At the time of the misrepresentations related to the DNA evidence, Winningham and Hughes were acting under color of law.

127. The misrepresentation of evidence against Plaintiff deprived Plaintiff of his liberty without due process, in violation of the Fourteenth Amendment to the United States Constitution.

128. The Estate of Winningham and Hughes are liable in their individual capacities for compensatory damages under 42 U.S.C. § 1983.

## FOR A SECOND CAUSE OF ACTION

## (42 U.S.C. § 1983 claim pursuant to the Due Process Clause of the 14th Amendment for misrepresentation of evidence against Defendant Crow)

129. Defendant Crow, at the times relevant to this Complaint, was an investigator with the North Carolina State Bureau of Investigation and tasked with investigating the murder of Irina Yarmolenko.

130. Defendant Crow knew or should have known Plaintiff's intellectual disabilities made it easy to mislead Plaintiff and misrepresent what Plaintiff told law enforcement.

131. Defendant Crow intentionally or with reckless disregard for Plaintiff's constitutional rights misrepresented evidence against Plaintiff, including

misrepresenting the nature of statements Plaintiff made to law enforcement.

132. At the time of the misrepresentations related to the evidence, Crow was acting under color of law.

133. The misrepresentation of evidence against Plaintiff deprived Plaintiff of his liberty without due process, in violation of the Fourteenth Amendment to the United States Constitution.

134. Defendant Crow is liable in his individual capacity for compensatory damages under 42 U.S.C. § 1983.

## FOR A THIRD CAUSE OF ACTION

**(42 U.S.C. § 1983 claim pursuant to the Due Process Clause of the 14th Amendment for misrepresentation of evidence against Defendant Terry)**

135. Defendant Terry, at the times relevant to this Complaint, was an investigator with the Mount Holly Police Department and tasked with investigating the murder of Irina Yarmolenko.

136. Defendant Terry knew or should have known Plaintiff's intellectual disabilities made it easy to mislead Plaintiff and misrepresent what Plaintiff told law enforcement.

137. Defendant Terry knew he was misrepresenting the sound evidence related to Plaintiff's ability to hear noise from the crime scene at his fishing spot.

138. Defendant Terry also misrepresented the condition of the victim's body and whether it was wet to fabricate incriminating evidence against Plaintiff.

139. Defendant Terry intentionally or with reckless disregard for Plaintiff's constitutional rights misrepresented evidence against Plaintiff, including misrepresenting the nature of statements Plaintiff made to law enforcement.

140. At the time of the misrepresentations related to the evidence, Terry was acting under color of law.

141. The misrepresentation of evidence against Plaintiff deprived Plaintiff of his liberty without due process, in violation of the Fourteenth Amendment to the United

States Constitution.

142. Defendant Terry is liable in his individual capacity for compensatory damages under 42 U.S.C. § 1983.

## FOR A FOURTH CAUSE OF ACTION

**(42 U.S.C. §1983 violation of Fourth Amendment against Defendants Crow and Terry for Unlawful Seizure)**

143. The Fourth Amendment to the United States Constitution guarantees all citizens, including Plaintiff, the right to be free from unlawful seizure.

144. Defendants Crow and Terry unlawfully arrested Plaintiff without probable cause.

145. Defendants Crow and Terry unlawfully continued the prosecution of Plaintiff without probable cause.

146. These actions by Defendants Crow and Terry violated Plaintiff's Fourth Amendment rights.

147. The actions of Defendants Crow and Terry were the direct and proximate cause of Plaintiff's damages, including embarrassment, humiliation, damage to reputation, emotional distress, and other harm caused by Defendants' actions.

## FOR A FIFTH CAUSE OF ACTION

**(42 U.S.C. §1983 violation of Fourth and Fourteenth Amendment against Defendants Crow and Terry for Malicious and Wrongful Prosecution)**

148. The Fourth Amendment to the United States Constitution guarantees all citizens, including Plaintiff, the right to be free from unlawful seizure.

149. The Fourteenth Amendment to the United States Constitution guarantees no State shall deprive a citizen of liberty without due process of law.

150. In wrongfully instituting and continuing a criminal action against Plaintiff as described in this Complaint, Defendants Crow and Terry violated Plaintiff's Fourth and Fourteenth Amendment rights.

151. The actions of Defendants Crow and Terry were the direct and proximate cause of Plaintiff's damages, including embarrassment, humiliation, damage to reputation,

emotional distress, and other harm caused by Defendants' actions.

<h2 style="text-align:center">FOR A SIXTH CAUSE OF ACTION</h2>

**(42 U.S.C. § 1983 *Monell* claim against Defendant City of Mount Holly for violations of Fourth and Fourteenth Amendments – Policies and Procedures)**

152. Defendant City of Mount Holly, at the times relevant to this Complaint, was responsible for the policies, practices, and customs of the Mount Holly Police Department.

153. The Mount Holly Police Department had a policy and practice of fabricating evidence, misrepresenting evidence, withholding exculpatory evidence, and failing to conduct constitutionally adequate investigations.

154. Officers of or working on behalf of the Mount Holly Police Department in Plaintiff's case withheld exculpatory evidence, misrepresented evidence, manufactured false evidence, and failed to conduct a constitutionally adequate investigation.

155. The failings and wrongful conduct by these officers were condoned and ratified by Defendant City of Mount Holly.

156. As a direct result of these actions by Defendant Mount Holly, the Plaintiff suffered damages including but not limited to wrongful arrest, prosecution, conviction, and incarceration.

157. Defendant Mount Holly is liable to Plaintiff for damages authorized by 42 U.S.C. § 1983.

<h2 style="text-align:center">FOR A SEVENTH CAUSE OF ACTION</h2>

**(42 U.S.C. §1983 violation of Fourth and Fourteenth Amendment against Defendant Stetzer for Malicious and Wrongful Prosecution)**

158. The Fourth Amendment to the United States Constitution guarantees all citizens, including Plaintiff, the right to be free from unlawful seizure.

159. The Fourteenth Amendment to the United States Constitution guarantees no State shall deprive a citizen of liberty without due process of law.

160. In wrongfully instituting and continuing a criminal action against Plaintiff as described in this Complaint, Defendant Stetzer violated Plaintiff's Fourth and Fourteenth Amendment rights.

161. The wrongful acts by Stetzer that give rise to this cause of action were not undertaken in his role as a prosecutor, but rather in his role as an investigator.

162. The actions of Defendant Stetzer were the direct and proximate cause of Plaintiff's damages, including embarrassment, humiliation, damage to reputation, emotional distress, and other harm caused by Defendants' actions.

## FOR AN EIGHTH CAUSE OF ACTION

## (42 U.S.C. § 1983 claim pursuant to the Due Process Clause of the 14th Amendment for misrepresentation of evidence against Defendant Workman)

163. Defendant Workman, at the times relevant to this Complaint, was a crime scene investigator with the Gaston County Police Department tasked with collecting and investigating fingerprints from the scene of Irina Yarmolenko's murder.

164. Defendant Workman intentionally or with reckless disregard for Plaintiff's constitutional rights misrepresented fingerprint evidence by failing to disclose or properly investigate exculpatory fingerprint evidence.

165. At the time of the misrepresentations and lack of investigation related to the fingerprint evidence, Workman was acting under color of law.

166. The misrepresentation of evidence against Plaintiff deprived Plaintiff of his liberty without due process, in violation of the Fourteenth Amendment to the United States Constitution.

167. Workman is liable in his individual capacity for compensatory damages under 42 U.S.C. § 1983.

## FOR A NINTH CAUSE OF ACTION

## (42 U.S.C. § 1983 *Monell* claim against Defendant City of Mount Holly for violations of Fourth and Fourteenth Amendments – Training)

168. Defendant City of Mount Holly, at the times relevant to this Complaint, was responsible for the policies, practices, and customs of the Mount Holly Police Department.

169. The Mount Holly Police Department failed to train its officers, including Defendant Terry and other officers involved in this case, in the proper and constitutional way to handle criminal investigations and evidence collection and interpretation.

170. Officers of or working on behalf of the Mount Holly Police Department in Plaintiff's case withheld exculpatory evidence, misrepresented evidence, manufactured false evidence, and failed to conduct a constitutionally adequate investigation.

171. These constitutional violations are highly predictable consequences of deliberate indifference to the need to train officers in the proper way to investigate crimes and handle or interpret evidence in a criminal investigation.

172. Defendant Mount Holly's deliberate indifference to an obvious need for training was the cause of the violations of Plaintiff's constitutional rights.

173. As a direct result of these actions by Defendant Mount Holly, the Plaintiff suffered damages including but not limited to wrongful arrest, prosecution, conviction, and incarceration.

174. Defendant Mount Holly is liable to Plaintiff for damages authorized by 42 U.S.C. § 1983.

## FOR A TENTH CAUSE OF ACTION

**(42 U.S.C. § 1983 claim pursuant to the Due Process Clause of the 14th Amendment for withholding of evidence against Defendant Murphy)**

175. Defendant Murphy, at the times relevant to this Complaint, was a law enforcement officer with the Gaston County Police Department and was given a statement about the murder of Ms. Yarmolenko that constituted exculpatory evidence as to Plaintiff.

176. Defendant Murphy intentionally or with reckless disregard for Plaintiff's

constitutional rights failed to disclose exculpatory evidence.

177. At the time of the failure to disclose exculpatory evidence, Murphy was acting under color of law.

178. The misrepresentation of evidence against Plaintiff deprived Plaintiff of his liberty without due process, in violation of the Fourteenth Amendment to the United States Constitution.

179. Workman is liable in his individual capacity for compensatory damages under 42 U.S.C. § 1983.

## FOR AN ELEVENTH CAUSE OF ACTION

## (42 U.S.C. § 1983 claim pursuant to the Due Process Clause of the 14th Amendment for bad faith failure to investigate against Defendants Crow, Terry, Murphy, and Workman)

180. Defendants Crow, Terry, Murphy, and Workman were all sworn law enforcement officers tasked with investigating the murder of Ms. Yarmolenko.

181. As a direct result of and in connection with the earlier described instances of fabricated and suppressed evidence, and to shield those constitutional violations described in this Complaint, the Defendants Crow, Terry, Murphy, and Workman failed to properly investigate this crime in an attempt to shield wrongdoing and constitutional violations.

182. The acts and omissions of these Defendants were done intentionally or with reckless disregard for Plaintiff's constitutional rights.

183. At all times related to this claim, the specific Defendants listed in this claim were acting under color of law.

184. The failure to investigate deprived Plaintiff of his liberty without due process, in violation of the Fourteenth Amendment to the United States Constitution.

185. Defendants Crow, Terry, Murphy, and Workman are liable in their individual capacity for compensatory damages under 42 U.S.C. § 1983.

# **PRAYER FOR RELIEF**

Plaintiff respectfully asserts his right to a jury trial pursuant to the Seventh Amendment to the United States Constitution and requests the Court grant judgment in his favor and award the following damages:

   a. All actual damages.

   b. All punitive damages as authorized by law.

   c. All attorneys' fees as authorized by law.

   d. Any other relief this Court deems appropriate or is authorized by any statute, law, or other source.

Respectfully Submitted,

***s/ Joshua Snow Kendrick***
Joshua Snow Kendrick
KENDRICK & LEONARD, P.C.
7 Mills Avenue (29605)
P.O. Box 6938
Greenville, SC 29606
Tel: (864) 760-4000
Fax: (803) 667-3187
Josh@KendrickLeonard.com
SC Bar No. 70453
SC Fed ID 9037

Attorney for the Plaintiff

S. Frederick Winiker
WINIKER LAW FIRM, PLLC
352 N. Caswell Rd.
Charlotte, NC 28204
Tel: (704) 333-8440
Fax: (704) 831-5274
SWiniker@WinikerLaw.com
NC State Bar No: 22390
Local Civil Rule 83.1(d) Attorney for Plaintiff