MARK CARVER,

                Plaintiff,

v.

CITY OF MOUNT HOLLY, *et al.*,

                Defendants.

**BRIEF IN SUPPORT OF MOTION TO
DISMISS BY KEVIN MURPHY AND
JIM WORKMAN
Fed. R. Civ. P. 12(b)(6)**

## I.    NATURE OF THE CASE

Irina Yarmolenko was murdered along the bank of the Catawba River in Mount Holly, North Carolina on May 5, 2008. (ECF 1, ¶¶ 20, 32). Mount Holly Police Department (hereinafter "MHPD") led the ensuing investigation, *id.* at ¶ 34, with assistance from the surrounding law enforcement agencies, as well as the North Carolina State Bureau of Investigation (hereinafter, "SBI"). On the day of the murder, Defendant Jim Workman, a Crime Scene Technician for the Gaston County Police Department (hereinafter, "GCPD"), processed the exterior of the victim's vehicle at the crime scene for latent fingerprints, none of which were of value for identification purposes. *Id.* at ¶¶ 14, 38. On July 10, 2008, Workman swabbed portions of the victim's vehicle for possible remnants of DNA left behind by the murderer. *Id.* at ¶ 44. The swabs were given to MHPD and sent to the SBI Lab for analysis. *Id.* at ¶¶ 44. The SBI Lab determined that Plaintiff's DNA matched one or more samples of DNA collected from the victim's vehicle, which Plaintiff asserts was incorrect. *Id.* at ¶¶ 78–87. Plaintiff denied having any involvement with the murder but was arrested by MHPD and charged with Yarmolenko's murder on December 12, 2008. *Id.* at ¶¶

1

92, 98. Following a jury trial in Gaston County Superior Court, he was convicted of first-degree murder on March 21, 2011, and received a mandatory life sentence. *Id.* at ¶ 1; *State v. Carver*, 221 N.C. App. 120, 725 S.E.2d 902 (2012), *aff'd*, 366 N.C. 372, 736 S.E.2d 172 (2013) (per curiam) (upholding conviction).

On December 8, 2016, Plaintiff filed a Motion for Appropriate Relief (hereinafter, "MAR") in Gaston County Superior Court. (ECF 1, ¶ 119); *see* Exhibit 1, MAR dated December 8, 2016. He submitted numerous exhibits with the MAR and supplemented his motion with additional claims twice. *See* Exhibit 1, MAR dated December 8, 2016; Exhibit 2, First Amended MAR dated July 20, 2018; Exhibit 3, Second Amended MAR dated April 8, 2019; *see also* Exhibit 4, Jim Workman Crime Scene Report (hereinafter, "Workman Report") (filed as Exhibit 4 to Plaintiff's MAR and cited therein at ¶¶ 23, 25, 38, 49). Collectively, Plaintiff asserted the following grounds for relief:

(1) ineffective assistance of counsel, *see* Exhibit 1, MAR at ¶¶ 143–94; Exhibit 2, First Amended MAR at ¶¶ 18–67;

(2) actual innocence, *see* Exhibit 1, MAR at ¶¶ 195–202;

(3) newly discovered evidence, *see* Exhibit 2, First Amended MAR at ¶¶ 68–75;

(4) misrepresentation of evidence at trial, *see id.* at ¶¶ 76–85;

(5) withholding evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), *see* Exhibit 2, First Amended MAR at ¶¶ 86–95; and

(6) presenting false evidence at trial, *see* Exhibit 3, Second Amended MAR at ¶¶ 2–38.

On June 5, 2019, after a nine-day evidentiary hearing that included testimony from twenty-five witnesses, the trial court granted Plaintiff's MAR on the grounds of ineffective assistance of counsel and newly discovered evidence related to the DNA evidence admitted at trial. (ECF 1, ¶

2

120); *see also* Exhibit 5, Order Granting MAR dated June 10, 2019 (hereinafter, "MAR Order"), at 8–11.[1] His conviction was set aside, and he was granted a new trial. Exhibit 5, MAR Order at 10–11. However, Plaintiff failed to show the existence of a *Brady* violation or that the State misrepresented critical evidence to the jury, and his MAR was denied on those grounds. *Id.* at 8–11. The court further found that it could not award relief based on his claim of actual innocence. *Id.* On August 12, 2022, the Gaston County District Attorney dismissed the charges against Plaintiff. (ECF 1, ¶ 124).

Plaintiff's suit against Defendants Workman and Murphy is an attempt to re-litigate the same issues he failed to support in his MAR. His claims against Workman and Murphy are barred by the doctrine of collateral estoppel, unsupported by facts showing a plausible entitlement to relief, and insufficient to overcome Workman's and Murphy's entitlement to qualified immunity.

## II.     STATEMENT OF FACTS

### A. Investigation and Prosecution

On May 5, 2008, around 10:52 a.m., Plaintiff Mark Carver and his cousin, Neal Cassada, met at a fishing hole on the Catawba River in Mount Holly, North Carolina, near the Stowe Family YMCA, located in Belmont. (ECF 1, ¶¶ 53–55, 63). Cassada left between 12:00 p.m. and 1:00 p.m., but Plaintiff stayed and continued to fish by himself. *Id.* at ¶ 59. At 1:07 p.m., two jet skiers on the river discovered a dead woman's body on the bank of the river near where Plaintiff was fishing and called 9-1-1. *Id.* at ¶¶ 16–17.

Officers from Belmont Police Department (hereinafter, "BPD") and MHPD responded to the scene and located the body of Irina Yarmolenko lying next to her vehicle at the water's edge.

---

[1] Defendants' Exhibits 1–5 are also available through the North Carolina Court of Appeals' electronic docket database, filed under *State v. Carver*, No. COA19-1055, 227 N.C. App. 89, 857 S.E.2d 539 (2021). Exhibits 1, 2, 3, and 5 are in the Printed Record on Appeal. Exhibit 4 is in the Volume I of the Supplemental Record on Appeal at the Bates number at the top of each page.

*Id.* at ¶¶ 20–22. She had been strangled to death by three ligatures tied around her neck—the drawstring of her sweatshirt, a blue ribbon, and a bungee cord—all of which came from inside her vehicle. *Id.* at ¶ 25. The vehicle had struck a tree stump near the waterline but was in neutral and not running at the time of impact. *Id.* at ¶¶ 22–23. Investigators determined that the murder occurred between 11:10 a.m. and 1:07 p.m. *Id.* at ¶ 32. MHPD led the investigation. *Id.* at ¶ 34. Around 2:15 p.m., MHPD Officer Robert Ellison encountered and spoke with Plaintiff near the scene. *Id.* at ¶ 60. Plaintiff left around 2:30 p.m. *Id.* at ¶ 62.

Later that day, Defendant Jim Workman, a Crime Scene Technician for GCPD was called in to assist with processing the crime scene by collecting latent fingerprints from the outside of the victim's vehicle. (ECF 1, ¶ 38). None of the prints he collected were of value for identification purposes. *Id.* On May 7, 2008, another officer collected latent prints from the interior of the vehicle. *Id.* at ¶ 42. On July 10, 2008, Workman was asked to swab the vehicle at the BPD station for possible DNA left behind by the murderer. *Id.* at ¶ 44. He swabbed numerous areas of the interior and exterior of the vehicle but did not swab the ignition, gear shift, or steering wheel. *Id.* at ¶¶ 44–45. Those surfaces were later swabbed for DNA by another officer. Exhibit 1, MAR at ¶ 91.

During the investigation, Plaintiff and Cassada participated in voluntary interviews with MHPD detectives and agents from the North Carolina State Bureau of Investigation (hereinafter, "SBI"). (ECF 1, ¶¶ 66–68, 73–77). Both denied having any involvement with the crime and being present at the crime scene. *Id.* at ¶¶ 68, 77, 98. On October 6, 2008, Plaintiff voluntarily provided a DNA sample and fingerprints to SBI Special Agent David Crow and MHPD Detective William Terry. *Id.* at ¶ 73. Following this interview, MHPD sent Plaintiff's DNA sample and the swabs Workman collected from the vehicle to the SBI Laboratory, now known as the State Crime Laboratory, for DNA analysis. *Id.* at ¶¶ 78–87.

The SBI Lab reported the DNA results to MHPD on December 10, 2008. *Id.* at ¶ 86. Analysts at the SBI Lab obtained a partial DNA profile from one of two swabs taken from the pillar above the driver-side rear door of the vehicle. *Id.* at ¶¶ 79–82; *see also* Exhibit 1, MAR at ¶ 87. They determined that the partial DNA profile was consistent with a mixture, and the predominant profile matched Plaintiff. (ECF 1, ¶¶ 79–82); Exhibit 1, MAR at ¶ 87a. Swabs from the passenger side of the vehicle matched Cassada. Exhibit 1, MAR at ¶ 87b. Plaintiff asserted that the SBI Lab conducted a flawed analysis and manipulated testing data to reach their desired result that his DNA matched the samples collected from the vehicle. (ECF 1, ¶¶ 81–85, 115).

Plaintiff was arrested by MHPD on December 12, 2008, and charged with first-degree murder and felony conspiracy. *Id.* at ¶ 92; Exhibit 1, MAR at ¶ 8. He was indicted by a Gaston County grand jury on the same charges three days later. Exhibit 1, MAR at ¶ 8. His trial began in Gaston County Superior Court on March 14, 2011, and, on March 21, 2011, the jury convicted him of first-degree murder. *Id.* at ¶¶ 9–12. The North Carolina Court of Appeals and North Carolina Supreme Court upheld his conviction. *See State v. Carver*, 221 N.C. App. 120, 725 S.E.2d 902 (2012), *aff'd*, 366 N.C. 372, 736 S.E.2d 172 (2013) (per curiam).

### B. Plaintiff's Motion for Appropriate Relief

On December 8, 2016, Plaintiff, through counsel, filed a Motion for Appropriate Relief in Gaston County Superior Court, asserting violations of his Sixth, Eighth, and Fourteenth Amendment rights, and their equivalents under the North Carolina Constitution. (ECF 1 ¶ 119); *see generally* Exhibit 1, MAR. Plaintiff filed an Amended MAR on July 20, 2018, with additional allegations and claims. *See generally* Exhibit 2, First Amended MAR. A nine-day evidentiary hearing on the MAR commenced in Gaston County Superior Court on April 2, 2019, during which

Plaintiff filed a Second Amended MAR. Exhibit 5, MAR Order at 1, ¶ 15; *see generally* Exhibit 3, Second Amended MAR.

In the MAR, Plaintiff argued, first, that his conviction should be vacated based on ineffective assistance of counsel and actual innocence. *See* Exhibit 1, MAR at ¶¶ 6, 98–194 (detailing errors by trial counsel); Exhibit 2, First Amended MAR at ¶¶ 18–67 (same). He further claimed that guidelines on DNA analysis first issued in 2010 constituted new evidence warranting a new trial. Exhibit 2, First Amended MAR at ¶¶ 46–47. He also argued that the State misrepresented the results of the SBI Lab's DNA analysis at trial. *Id.* at ¶¶ 76–85.

Next, Plaintiff alleged that at an unspecified time in 2011, Carol Ingle shared information with GCPD Officer Kevin Murphy that was not disclosed to Plaintiff before trial but likely would have changed the verdict had the jury heard Ingle's testimony. *Id.* at ¶¶ 73, 75. Ingle told Plaintiff's trial counsel's private investigator that on May 5, 2008, around 11:00 a.m., she was driving on N.C. Highway 273 near the crime scene when she saw a vehicle similar to the victim's, which Ingle saw on television later that night, driving at a high rate of speed. *Id.* at ¶ 70. Ingle saw the vehicle turn into the road that leads to the YMCA in Mount Holly and described the driver as a young white male, approximately 5'10" with a stocky build and medium brown hair. *Id.* Approximately thirty minutes later, she was driving home on the same road and saw the same man walking along the road. *Id.* at ¶ 71. She saw Plaintiff and Cassada in the news and said neither was the man she saw walking on the highway. *Id.* at ¶ 72. She stated that she relayed this information to GCPD Officer Kevin Murphy in 2011, but the prosecution never followed up with her. *Id.* at ¶ 73. Plaintiff argued, "[w]hen combined with the information included in Carver's MAR and this amendment, there is more than a reasonable probability that the verdict would have been different,"

6

had the jury heard testimony from Ingle. *Id.* at ¶ 75. He asserted the same facts and contentions in the Complaint. (ECF 1, ¶¶ 99–105, 175–79).

Plaintiff also compared Workman's trial testimony regarding the fingerprints he collected and analyzed to his testimony at the MAR hearing. Exhibit 3, Second Amended MAR at ¶¶ 7–16. At trial, Workman testified that one latent fingerprint he lifted from the <u>exterior</u> of the vehicle was "of some value," but he could not compare it to any known samples and affirmed that he did not find Plaintiff's fingerprints at the crime scene. *Id.* at ¶¶ 7–10. At the MAR hearing, Workman testified that he compared a latent print to a known sample from Plaintiff and concluded that it was not a match. *Id.* at ¶ 14. Plaintiff submitted that Workman's trial testimony was false and that he withheld exculpatory facts from the jury such that there was a reasonable likelihood that the additional details elicited during the MAR hearing would have swayed the jury to a different result. *Id.* at ¶¶ 17–20; *see also* (ECF 1, ¶ 113) (raising the same claim). However, Plaintiff conceded that Workman's report documenting this alleged inconsistency was produced to his trial counsel. *Id.* ¶ at 20a; *see* Exhibit 4, Workman Report.

### C. Gaston County Superior Court Ruling on Plaintiff's MAR

Twenty-five witnesses testified over the course of the nine-day evidentiary hearing on Plaintiff's MAR. Exhibit 5, MAR Order at 2, ¶ 15. The state court considered all of Plaintiff's claims detailed in the MAR and supplements, Plaintiff's and the State's pleadings and exhibits, evidence offered during the hearing, and arguments from Plaintiff and the State. *Id.* The court granted Plaintiff's MAR and ordered a new trial on two grounds: (1) ineffective assistance of counsel due to his trial counsel's failure to fully and thoroughly investigate the case, *id.* at 8–10, ¶¶ 5–16, and (2) newly discovered evidence in the form of scientific advances in DNA testing, *id.* at 10, ¶¶ 17–24; *see also id.* at 5, ¶ 41 (finding Plaintiff's newly discovered evidence claim was

7

limited to "scientific advances in . . . the testing, analysis, and interpretation of DNA mixtures."). The exhibits and uncontroverted expert testimony offered by Plaintiff showed that the new standards for DNA testing and analysis would not have yielded a match between Plaintiff and the samples taken from the victim's vehicle. *Id.* at 6–7, ¶¶ 43–58. "The DNA evidence in this case is the lynchpin and basis of Mr. Carver's conviction for first degree murder," *id.* at 7, ¶ 59, and Plaintiff otherwise met his burden on newly discovered evidence, *id.* at 9–10, ¶¶ 17–24.

However, the court concluded that Plaintiff failed to show "any *Brady* violations" or misrepresentations of material evidence by the State. *Id.* at 8, ¶¶ 63–64, ¶¶ 2–3. His MAR was denied on these claims. *Id.* at 10, ¶ 1.

### D.  Suit against Defendants Murphy and Workman

Plaintiff filed the Complaint on August 8, 2025, naming Kevin Murphy and Jim Workman as Defendants in their individual capacities and alleging claims under to 42 U.S.C. § 1983, for violations of the Due Process Clause of the Fourteenth Amendment based on:

1.  Misrepresentation of Evidence by Workman, (ECF 1, ¶¶ 163–67);

2.  Withholding of evidence by Murphy, *id.* at ¶¶ 175–79; and

3.  Bad faith failure to investigate by Murphy and Workman, *id.* at ¶¶ 180–85.

Plaintiff's claims against Murphy and Workman must be dismissed because each is barred by the doctrine of collateral estoppel, the allegations in the Complaint fail to state a plausible claim against Murphy and Workman, and both Murphy and Workman are entitled to qualified immunity.

### III.   ARGUMENT

Dismissal is proper under Rule 12(b)(6) of the Federal Rules of Civil Procedure when the well-pled facts, viewed in the light most favorable to the plaintiff, do not state a facially plausible claim for relief against the moving defendants. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While

8

the plaintiff need not submit detailed factual allegations, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of the cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007)).

When the allegations in the complaint reveal the existence of an affirmative defense, the defense may be raised in a Rule 12(b)(6) motion and supported by exhibits, so long as the exhibits are integral to the complaint and authentic or constitute matters properly subject to judicial notice. *Phillips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *see Massey v. Ojaniit,*, 759 F.3d 343, 347 (4th Cir. 2014) (taking judicial notice of criminal trial transcript and dismissing complaint based on qualified immunity); *Davani v. Virginia Dep't of Transp.*, 434 F.3d 712, 720–21 (4th Cir. 2006) (citing *Andrews v. Daw*, 201 F.3d 521, 524, n. 1 (4th Cir. 2000)) (directing district court to allow parties to supplement record on Rule 12(b)(6) motion and address collateral estoppel and res judicata). Furthermore, the Court may disregard allegations that "contradict matters properly subject to judicial notice or by exhibit." *Massey*, 759 F.3d at 347 (quoting *Blankenship v. Manchin*, 471 F.3d 523, 529 (4th Cir. 2006)).

Plaintiff referenced the MAR and state court order vacating his conviction in the Complaint. (ECF 1, ¶¶ 119–20). Indeed, he could not have filed this suit without the MAR Order. *See Heck v. Humphrey*, 512 U.S. 477, 484–85 (1994) (prohibiting "§ 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement."); *McDonough v. Smith*, 588 U.S. 109, 118 (2019) (applying the same rationale to the plaintiff's Fourteenth Amendment fabrication of evidence claims). It follows that Defendants' Exhibits 1–5 are integral to the Complaint. In addition, these documents are authentic public records on file with the North Carolina Court of Appeals. *See State v. Carver*, No. COA19-1055, 227 N.C. App. 89, 857

9

S.E.2d 539 (2021). Accordingly, the exhibits are properly before the Court on this motion. *See Davani*, 434 F.3d at 720–21 (requiring a developed record with court filings from underlying proceedings to address collateral estoppel on motion to dismiss). To the extent Defendants' Exhibits 1–5 are not found to be integral to the Complaint, they are public records and should be considered through judicial notice. *Massey*, 758 F.3d at 347.

### A. THE DOCTRINE OF COLLATERAL ESTOPPEL PRECLUDES PLAINTIFF FROM ESTABLISHING THE ESSENTIAL ELEMENTS OF HIS CLAIMS AGAINST MURPHY AND WORKMAN.

Vicarious liability is inapplicable to Plaintiff's claims against Murphy and Workman. *Iqbal*, 556 U.S. at 676. Plaintiff's claims can survive dismissal only if he stated a plausible claim "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.*

To state a § 1983 claim for misrepresentation of evidence in violation of the Due Process Clause of the Fourteenth Amendment, the plaintiff must plead facts showing that the defendant-officer (1) deliberately (2) fabricated, misrepresented, or omitted material evidence and (3) that the fabrication caused his conviction and subsequent incarceration. *Massey*, 759 F.3d at 354. Materiality and causation are determined hand-in-hand by examining the nature of the misrepresentation and the impact it could have on the jury's judgment. *See id.* at 354–56 (analyzing, separately, an officer's fabricated testimony of witnesses' descriptions of the suspect and another officer's misrepresentation of a witness' identification of plaintiff in a photo lineup). In addition to proving that the fabricated or misleading evidence in-fact caused the conviction, the plaintiff "must also be able to show that, despite any intervening acts of independent decision-makers," the prosecutor, magistrate, judge, grand jury, or trial jury, "the 'conviction was a reasonably foreseeable result of the initial act of [misrepresentation].'" *Id.* (quoting *Washington v.*

*Wilmore*, 407 F.3d 274, 282–83 (4th Cir. 2005)); *see also Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) ("[C]onstitutional torts . . . require a demonstration of both but-for and proximate causation.").

Separately, prosecutors have an affirmative duty to disclose favorable exculpatory and impeachment evidence to the defendant. *Brady*, 373 U.S. at 87; *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). A prosecutor's failure to disclose such evidence, even accidentally, violates the accused's constitutional rights when the evidence is "material." *See Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 396–97 n. 6 (4th Cir. 2014) (distinguishing prosecutors' *Brady* duty from that of law enforcement). "Evidence is material if there is a 'reasonable probability that its disclosure would have produced a different result.'" *Gilliam v. Sealey*, 932 F.3d 216, 238 (4th Cir. 2019) (quoting *United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015)). The "reasonable probability" standard is met when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict" or the integrity of the proceedings. *Kyles*, 514 U.S. at 437; *Owens*, 767 F.3d at 397. If the defense already had the evidence or it was available from other sources, including a diligent investigation, there is no *Brady* violation. *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011) (citing *Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002)).

To maintain a *Brady*-based claim against a police officer, the plaintiff must allege and prove that material, favorable evidence was withheld, and further show that the officer suppressed the evidence in bad faith. *Owens*, 767 F. 3d at 396 n. 6 (citing *Jean v. Collins*, 221 F.3d 656, 660 (4th Cir. 2000) (en banc) (Wilkinson, C.J., concurring)); *cf. Daniels v. Williams*, 474 U.S. 327, 328 (1986) (holding negligence does not violate the Constitution). Conclusory allegations that officers acted in a "willful, wanton, and reckless manner" will not suffice. *Jean*, 221 F.3d at 662

11

(Wilkinson, C.J., concurring). The plaintiff must show that the investigating officer intentionally withheld the evidence for the purpose of depriving the plaintiff of its use at trial and negate any negligent or innocent explanation for the officer's conduct. *Gilliam*, 932 F.3d at 241 (citing *Jean*, 221 F.3d at 663 (Wilkinson, C.J., concurring)); *Howard*, 68 F.4th at 948–49. Additionally, an officer's duty under *Brady* does not extend beyond the defendant's conviction. *Howard*, 68 F.4th at 947.

There is no constitutional right to the investigation of a third party. *Gilliam*, 932 F.3d at 240. Nor do police officers have a duty to "investigate independently every claim of innocence" or "perform an error-free investigation." *Baker v. McCollan*, 443 U.S. 137, 146 (1979). The failure to investigate other leads, if determined to be negligent or even grossly negligent, does not violate due process. *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 955 (8th Cir. 2001) (citing *Daniels v. Williams*, 474 U.S. 327, 334 (1986)). An independent due process violation for failing to perform an adequate investigation exists only when an officer takes bad faith actions to shield his own misconduct. *Gilliam*, 932 F.3d at 240–41 (involving coerced or fabricated confessions used to establish probable cause to arrest and suppressing exculpatory evidence post-arrest to shield the lack of probable cause). Thus, to state a claim for "bad faith failure to investigate" the plaintiff must show that (1) the officer intentionally fabricated or suppressed evidence (2) to cover up prior wrongful acts, which (3) caused the plaintiff's loss of liberty. *Id.* at 241.

Collateral estoppel prevents the re-litigation of legal and factual issues that were already raised and litigated by the party in a prior proceeding. *In re Varat Enters., Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996). Decisions rendered by state courts are binding on parties that had a full and fair opportunity to litigate the issue and may not be re-litigated in a subsequent suit under § 1983 in federal court. *Allen v. McCurry*, 449 U.S. 90, 104 (1980). The forum state's collateral estoppel test

applies to determine the preclusive effect of a state court judgment. *In re McNallen*, 62 F.3d 619, 624 (4th Cir. 1995).

In North Carolina, collateral estoppel applies to any fact, question, or right in issue when: (1) the issues are identical in both proceedings; (2) the issue was raised and actually litigated in the prior case, (3) the issue was material and relevant to the disposition of the prior proceeding; and (4) deciding the issues in the prior proceeding was necessary and essential to the resulting judgment. *State v. Summers*, 351 N.C. 620, 623, 528 S.E.2d 17, 20 (2000). Civil defendants who were not parties to the prior proceeding may assert collateral estoppel offensively to prevent a plaintiff from re-litigating identical issues that were decided in an earlier case. *Burton v. City of Durham*, 118 N.C. App. 676, 680, 457 S.E.2d 329, 332 (1997) (applying collateral estoppel to state court's denial of motion to suppress).

On a motion for appropriate relief, the defendant has the burden of proving each asserted ground for relief by a preponderance of the evidence. N.C.G.S. §§ 15A-1420(c)(5)–(6); *see also* N.C.G.S. § 15A-1415(b)(3) (allowing motions asserting, "[t]he conviction was obtained in violation of the Constitution of the United States or the Constitution of North Carolina."). When the defendant asserts a right to relief based on an alleged violation of his constitutional rights, the court must make and enter conclusions of law and find that the defendant has had a full and fair hearing on the merits of the grounds so asserted. *Id.* § 15A-1420(c)(7). If the defendant carries his burden of proving a constitutional violation, prejudice is presumed. *Id.* § 15A-1443(b). If any part of the motion is denied, the defendant can seek appellate review by direct appeal or a petition for a writ of certiorari. *Id.* § 15A-1442(4) (allowing appellate review of "denial of post-trial motion or relief to which defendant is entitled, to his prejudice"); *State v. Thomsen*, 369 N.C. 22, 26–27, 789

13

S.E.2d 639, 642–43 (2016) (holding appellate courts' power to issue writ of certiorari to any party not limited by other provisions of N.C.G.S. § 15A-1422).

**1. Under the doctrine of collateral estoppel, Plaintiff cannot establish the essential elements of his § 1983 claim against Workman for misrepresentation of evidence.**

North Carolina state courts apply the same standards that would apply in federal court when reviewing a defendant's motion for appropriate relief based on claimed violations of his Fourteenth Amendment due process rights. *See, e.g.*, *State v. McDowell*, 310 N.C. 61, 67, 310 S.E.2d 301, 305–06 (1984) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (use of false evidence); *Brady*, 373 U.S. 83 (non-disclosure of material, favorable evidence); *United States v. Agurs*, 427 U.S. 97 (1976) (same)). Accordingly, Plaintiff relied almost exclusively on language from the United States Supreme Court in asserting due process violations in his MAR. *See* Exhibit 2, First Amended MAR at ¶¶ 75, 86–88; Exhibit 3, Second Amended MAR at ¶¶ 2–5, 18, 20.

In Plaintiff's MAR claim asserting that the State used false evidence to secure the conviction in violation of his due process rights, he was required to show, "the testimony was in fact false, material, and knowingly and intentionally used by the State to obtain his conviction." *State v. Sanders*, 327 N.C. 319, 336, 395 S.E.2d 412, 423 (1990) (quoting *State v. Robbins*, 319 N.C. 465, 514, 356 S.E.2d 279, 308 (1987), *cert. denied*, 484 U.S. 918 (1987)). False testimony is material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* at 336, 395 S.E.2d at 424 (quoting *Agurs*, 427 U.S. at 103) (collecting cases).

Plaintiff compared Workman's trial testimony regarding the latent fingerprints he collected and later examined with his MAR hearing testimony and asserted that the former was false. Exhibit 3, Second Amended MAR at ¶¶ 7–20. *But see State v. Chatman*, 308 N.C. 169, 177, 301 S.E.2d

14

71, 76 (1983) (holding defendant cannot be prejudiced by evidence elicited by his counsel on cross-examination of the State's witness). He argued that the State's use of this evidence at trial had a reasonable likelihood of affecting the jury's judgment, warranting a new trial. Exhibit 3, Second Amended MAR at ¶¶ 2–20a. (citing *Mooney*, 294 U.S. at 112, *Napue*, 360 U.S. at 269, and *Sanders*, 327 N.C. at 336, 395 S.E.2d at 423–24). The trial court denied Plaintiff's MAR on this basis, holding that he failed to establish that the State misrepresented critical evidence to the jury. Exhibit 5, MAR Order at 8, ¶ 3.

Plaintiff must prevail on the same issues in his § 1983 claim against Workman for misrepresentation of evidence in violation of his Fourteenth Amendment rights. *See* (ECF 1, ¶¶ 38, 44–45, 113, 163–67). Specifically, he must be able to allege and prove that Workman misrepresented material evidence and that the misrepresentation caused his conviction and subsequent incarceration. *Massey*, 759 F.3d at 354. Plaintiff's burden here would be more onerous because his § 1983 claim can survive based only on Workman's conduct, *Iqbal*, 556 U.S. at 676, and he would have to show that Workman's misrepresentation, if any, was deliberate, *Massey*, 759 F.3d at 354. However, the threshold issues of whether there was a misrepresentation or false statement and a reasonable likelihood of affecting the jury's judgment is the same here as it was in Plaintiff's MAR.

Workman's alleged misrepresentation of material evidence was raised and actually litigated in the prior proceeding, as Plaintiff asserted it as an additional claim during the evidentiary hearing. Exhibit 3, Second Amended MAR at ¶¶ 2–20a. In addition, the issues were material and relevant to the disposition of his MAR and necessary and essential to the resulting judgment because the state court was required by law to make the rulings, *see also* N.C.G.S. § 15A-1420(c)(7) (requiring the court to make conclusions of law on any asserted violation of the defendant's constitutional

15

rights), and the State's use of any false, material evidence to obtain a conviction would entitle a defendant to a new trial. *Sanders*, 327 N.C. at 336, 395 S.E.2d at 423–24.

In denying Plaintiff's MAR on this ground, the court necessarily determined that Workman's trial testimony was either not misleading or that the misrepresentation described was not material, meaning there was no "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* Either conclusion precludes Plaintiff from establishing the essential elements of his misrepresentation of evidence claim against Workman. *Massey*, 759 F.3d at 354. Furthermore, by statute, the court was required to find that Plaintiff "had a full and fair hearing on the merits" of his claimed constitutional violations. N.C.G.S. § 15A-1420(c)(7). This "full and fair opportunity" to litigate the issue is the core limitation of the doctrine of collateral estoppel. *Allen*, 449 U.S. at 95.

The doctrine of collateral estoppel applies to Plaintiff's Fourteenth Amendment misrepresentation of evidence claim against Workman, so Plaintiff is bound by the state court's denial of his MAR on this basis and may not attempt to re-litigate the same issues here. Because Plaintiff is unable to establish the essential elements of his Fourteenth Amendment misrepresentation of evidence claim against Workman, this claim must be dismissed.

### 2. The same result must follow for Plaintiff's Fourteenth Amendment withholding of evidence claim against Murphy.

On Plaintiff's MAR asserting that the State failed to disclose material, favorable evidence in violation of due process, he was required to show that the State withheld "evidence that [was] favorable to the defense and *material* to the defendant's guilt or punishment." *State v. Best*, 376 N.C. 340, 348, 852 S.E.2d 191, 198 (2020) (quoting *Turner v. United States*, 582 U.S. 313, 315 (2017)). "To establish prejudice on such a claim, often referred to as a *Brady* claim, a defendant must show that 'there is a reasonable probability that, had the evidence been disclosed to the

16

defense, the result of the proceeding would have been different.'" *Id.* (quoting *Bagley*, 473 U.S. at 682)). A reasonable probability is less than a preponderance but likely enough to undermine confidence in the outcome of the trial. *Id.* (citing *Kyles*, 514 U.S. at 434). These elements—that the evidence was withheld, favorable to the defense, and material to Plaintiff's conviction—are identical Plaintiff's § 1983 claim against Murphy. (ECF 1, ¶¶ 175–79); *see Owens*, 767 F.3d at 396–97.

In the MAR, Plaintiff alleged that sometime in 2011, Carol Ingle told Murphy that on the day of the murder, around the same time of day, and on the highway near the scene, she witnessed a vehicle similar to the victim's being driven by a young white male who was not Plaintiff and, about thirty minutes later, saw the same male walking along the same road. Exhibit 2, First Amended MAR at ¶¶ 68–73. Plaintiff claimed that this evidence was not disclosed to him before trial. *Id.* He argued, "[h]ad the jury heard testimony from Ms. Ingle, . . .when combined with the information included in Carver's MAR and this amendment, there is more than a reasonable probability that the verdict would have been different. *Id.* at ¶ 75. He titled this as a claim based on newly discovered evidence, rather than under his separate claim regarding a different witness and officers for withholding of evidence in violation of *Brady*, but his arguments—asserting misconduct by the State and applying the "reasonable probability" standard in *Kyles*, 514 U.S. at 434—was the same for both. *Id.* ¶¶ 68–75, 86–95. Here, Plaintiff raised the same factual allegations to assert a *Brady*-based § 1983 claim against Murphy. (ECF 1, ¶¶ 99–105, 175–79).

In the MAR proceedings, after reviewing the evidence and arguments from counsel, the state court indicated that Plaintiff's allegations regarding Ingle, like the other witness, raised a *Brady* issue and concluded that he failed to carry his burden of proving any such violation. *See* Exhibit 5, MAR Order at 8, ¶ 2 ("The defense has failed to establish . . . that the State committed

17

any 'Brady' violations.") (emphasis added); *id.* at 5, ¶ 41 (finding Plaintiff's newly discovered evidence claim was based solely on evidence "in the form of scientific advances in DNA testing"). Thus, although Plaintiff characterized his MAR claim regarding Ingle and Murphy differently in his written motion, he raised and litigated the same issues germane to his § 1983 claim against Murphy here, and the state court ruled on the MAR under those terms.

Barring a conclusion that Murphy disclosed Ingle's alleged report or that her observations were not favorable to Plaintiff, the state court necessarily determined there was not a reasonable probability that Murphy disclosing Ingle's report to the defense would have produced a different result at trial or undermine the court's confidence in the verdict. *See Bagley*, 473 U.S. at 682; *Best*, 376 N.C. at 348, 852 S.E.2d at 198. Because the state court concluded that Plaintiff could not state a viable *Brady* claim in his MAR, even with the benefit of an accumulation of alleged prosecutorial misconduct, *see Berger v. United States*, 295 U.S. 78, 88–89 (1935) (considering cumulative effect of misconduct to warrant a new trial), he cannot make the threshold showing to maintain a § 1983 claim against Murphy here. *See* Exhibit 2, First Amended MAR at ¶ 75 (arguing cumulative effect); *Iqbal*, 556 U.S. at 676 (requiring § 1983 plaintiff to allege plausible claim against each individual government-official defendant based on individual's own actions); *Owens*, 767 F.3d at 396–97 (discussing elements of *Brady*-based § 1983 claim against officer).

The state court's ruling on Plaintiff's *Brady* claim in his MAR was material and relevant to the disposition of the motion and necessary and essential to the resulting judgment for the same reasons discussed above with respect to his misrepresentation of evidence claim against Workman. A favorable result would have afforded Plaintiff a new trial. Furthermore, the court was required to "make and enter conclusions of law" on these issues and find that Plaintiff "had a full and fair

18

hearing on the merits of the grounds so asserted." N.C.G.S. § 15A-1420(c)(7); *see Allen*, 449 U.S. at 95.

The doctrine of collateral estoppel plainly applies to Plaintiff's *Brady* claim against Murphy. He is bound by the state court's ruling denying his MAR on this basis and may not now re-litigate whether Murphy's alleged suppression of Ingle's report violated his due process rights. Therefore, this claim must be dismissed.

### 3. Plaintiff cannot maintain a § 1983 claim for bad faith failure to investigate against Murphy or Workman because the doctrine of collateral estoppel precludes him from establishing the requisite underlying misconduct.

Plaintiff can pursue an independent § 1983 claim for bad faith failure to investigate against Murphy or Workman only if he can show that the officer took bad faith actions to cover up his own misconduct. *Gilliam*, 932 F.3d at 240–41. Murphy and Workman cannot be held liable under § 1983 for the actions of Defendants Crow and Terry. *Iqbal*, 556 U.S. at 676; *see* (ECF 1, ¶¶ 180–85).

Because Plaintiff's underlying claims against Murphy and Workman are barred by the doctrine of collateral estoppel based on the state trial court's denial of his MAR for any reason other than ineffective assistance of counsel and new evidence in the form of scientific advances in DNA testing, he cannot establish the seminal "bad act" necessary to pursue a bad faith failure to investigate claim. *See* Exhibit 5, MAR Order at 8–10, ¶¶ 2–24; *Gilliam*, 932 F.3d at 240–41. As discussed above, the issues of Murphy's and Workman's alleged misconduct were raised, litigated, and necessarily decided by the state court ruling on Plaintiff's MAR. These conclusions defeat his bad faith failure to investigate claim outright because the trial court concluded, as a matter of law, that neither Murphy nor Workman violated Plaintiff's constitutional rights in the first place. Thus,

19

Plaintiff's bad faith failure to investigate claims against Murphy and Workman must be dismissed under the doctrine of collateral estoppel.

### 4. The state court's ruling granting Plaintiff's MAR defeats his § 1983 claims against Murphy and Workman.

For each of Plaintiff's § 1983 claims against Murphy and Workman, he must demonstrate "both but-for and proximate causation." *Evans*, 703 F.3d at 647. The state court's unequivocal finding that, "[t]he DNA evidence in this case is the lynchpin and basis of Mr. Carver's conviction for first degree murder," precludes him from proving causation on a Fourteenth Amendment claim here. *See* Exhibit 5, MAR Order at 7, ¶ 59. The court found that Plaintiff was prejudiced in the underlying criminal proceedings and entitled to a new trial because his trial counsel failed to research, investigate, and develop his defense attacking the reliability of the SBI Lab's DNA analysis, which his expert at the MAR hearing successfully undermined based on new developments in DNA testing. *Id.* at 9–10, ¶¶ 6–24. The state court determined, as a matter of law, that these factors were the sole causes of prejudice to Plaintiff and resulted in his conviction. *Id.*; *see cf.* N.C.G.S. § 15A-1443(b) (stating prejudice is presumed if defendant establishes constitutional violation).

Even if Plaintiff could establish the other elements of his due process claims against Murphy and Workman, he cannot avoid the trial court's conclusion that his deprivation of liberty did not result from Murphy's or Workman's conduct. *See Evans*, 703 F.3d at 647. The issue of what caused prejudice in the underlying criminal proceedings is identical to Plaintiff's burden to prove causation on each of his due process claims here. This issue was raised and litigated on each ground stated in Plaintiff's MAR. Furthermore, it was material and relevant to the disposition of his MAR and was necessary and essential to the resulting judgment because Plaintiff's right to a new trial depended on these findings. *See Summers*, 351 N.C. at 623, 857 S.E.2d at 20. Therefore,

20

the doctrine of collateral estoppel precludes Plaintiff from establishing that any alleged misconduct by Murphy or Workman caused his conviction, and all of his § 1983 claims against them must fail as a matter of law.

**B. THE CLAIMS AGAINST MURPHY AND WORKMAN SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM AND ON THE BASIS OF QUALIFIED IMMUNITY.**

"When a government official is sued in their individual capacity, qualified immunity protects them 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sharpe v. Winterville Police Dep't*, 59 F.4th 675, 682–83 (4th Cir. 2023) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). To overcome the defendant's presumptive entitlement to qualified immunity, it is Plaintiff's burden to show (1) that a constitutional violation occurred, and (2) that the constitutional right asserted was clearly established at the time of the alleged violation. *Crawford-El v. Britton*, 523 U.S. 574, 589 (1998); *Davis v. Scherer*, 468 U.S. 183, 197 (1984) ("A plaintiff who seeks damages for violation of constitutional or statutory rights may overcome the defendant official's qualified immunity only by showing that those rights were clearly established at the time of the conduct at issue.").

**1. Plaintiff failed to allege a plausible Fourteenth Amendment misrepresentation of evidence claim against Workman, and Workman is immune from suit for the conduct alleged.**

The facts alleged regarding Workman fail to state a facially plausible claim that he violated Plaintiff's clearly established constitutional rights. The sum of factual allegations against Workman is that he collected latent fingerprints from the exterior of the victim's vehicle on the day of the murder and, approximately two months later, swabbed the vehicle for remnants of DNA but failed to swab the gear shift, ignition switch, or steering wheel. (ECF 1, ¶¶ 38, 44–45). Plaintiff

21

then made the conclusory assertion that Workman "possessed exculpatory fingerprint evidence and failed to disclose and/or pursue that exculpatory evidence." *Id.* at ¶ 113. He later asserted that Workman "intentionally or with reckless disregard for Plaintiff's constitutional rights misrepresented fingerprint evidence by failing to disclose or properly investigate" the evidence, thereby depriving him of liberty without due process. *Id.* at ¶¶ 164, 166. This "formulaic recitation of the elements of the cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Plaintiff's assertion that Workman misrepresented fingerprint evidence was completely "devoid of 'further factual enhancement,'" and therefore cannot state a plausible claim for relief. *Id.* He offered no factual enhancement showing when or to whom Workman allegedly misrepresented evidence or how the evidence was exculpatory. The fact that Workman collected fingerprint evidence from the exterior of the victim's vehicle does not plausibly allow the court to infer that he possessed exculpatory fingerprint evidence, much less misrepresented or failed to disclose it. *See id.* ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

If Plaintiff's claim is that Workman testified falsely at trial, he has absolute immunity from a § 1983 suit for his trial testimony. *Briscoe v. LaHue*, 460 U.S. 325, 335–36 (1983). Likewise, to the extent Plaintiff's recitation of the elements of his claim raised the possibility of a *Brady* claim against Workman, Plaintiff's admission in his MAR that the fingerprint evidence to which he alluded in the Complaint was available to his trial counsel at the time of trial defeats a potential *Brady* claim, *ab initio*. *See* Exhibit 3, Second Amended MAR at ¶ 20a.; *Higgs*, 663 F.3d at 735 ("[T]here is no *Brady* violation if . . . the defense already possesses the evidence."); *see also State*

22

*v. Chatman*, 308 N.C. 169, 177, 301 S.E.2d 71, 76 (1983) (holding defendant cannot be prejudiced by evidence elicited by his counsel on cross-examination of the State's witness).

Additionally, assuming, *arguendo*, that Workman misrepresented evidence, which Defendants deny, Plaintiff did not allege that he did so deliberately, that the evidence was material, or that the misrepresentation in-fact and proximately caused Plaintiff's conviction and subsequent incarceration. *Massey*, 759 F.3d at 354. Thus, the allegations in the Complaint fail to show that Workman violated Plaintiff's clearly established constitutional rights, so this claim must be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and on the basis of qualified immunity. *Crawford-El*, 523 U.S. at 589.

### 2. Plaintiff failed to state a claim against Murphy for violation of his clearly established Fourteenth Amendment rights.

Similarly, the facts alleged regarding Murphy do not permit a plausible inference that he violated Plaintiff's clearly established constitutional rights. *See* (ECF 1, ¶¶ 99–105). Plaintiff's narrative regarding Ingle's alleged report to Murphy hardly provided facts that could qualify as exculpatory, let alone material for purposes of a *Brady* claim. *See Kyles*, 514 U.S. at 437; *Gilliam*, 932 F.3d at 238. Moreover, Plaintiff failed to offer even a "naked assertion" that Murphy failed to disclose this evidence in bad faith, (ECF 1, ¶¶ 175–79), which still would have been insufficient for lack of factual enhancement. *Iqbal*, 556 U.S. at 678; *Gilliam*, 932 F.3d at 241. His unsupported allegation that Murphy acted "intentionally or with reckless disregard for Plaintiff's constitutional rights," (ECF 1, ¶ 176), does not save this claim. *Jean*, 221 F.3d at 662 (Wilkinson, C.J., concurring).

In addition to Plaintiff's failure to state a *prima facie* claim for withholding of evidence, the Complaint does not state sufficient facts to overcome Murphy's presumptive entitlement to qualified immunity because Plaintiff's clearly established rights in this area protected him from

23

being "deprived of liberty as a result of the intentional, bad-faith withholding of evidence by an investigating officer." *Gilliam*, 932 F.3d at 241 (emphasis added). He did not have a constitutionally protected right to the disclosure of exculpatory evidence received by any police officer at any time. Other than alleging that Murphy worked for GCPD, there is no basis to infer that he was an investigating officer or otherwise involved in Plaintiff's case. Therefore, Plaintiff's § 1983 claim against Murphy for withholding of evidence should be dismissed for failure to state a claim and on the basis of qualified immunity.

### 3. Plaintiff's bad faith failure to investigate claim against Murphy and Workman is meritless.

Plaintiff made the same terse attempt at stating claims against Murphy and Workman for bad faith failure to investigate, relying on "the earlier described instances of fabricated and suppressed evidence," and claiming, "to shield those constitutional violations . . . [Defendants] failed to properly investigate this crime in an attempt to shied wrongdoing and constitutional violations." (ECF 1, ¶¶ 180–85). Even if Plaintiff pled sufficient factual matter to show an underlying constitutional violation by Murphy or Workman, he alleged no facts allowing a plausible inference that either officer in bad faith failed to adequately investigate the crime to cover up his earlier misconduct. *Gilliam*, 932 F.3d at 241. Plaintiff does not have a constitutional right to law enforcement conducting a perfect investigation or investigating fully every claim of innocence or lead. *Baker*, 443 U.S. at 146; *Daniels*, 474 U.S. at 334; *Sattler v. Johnson*, 857 F.2d 224, 227 (4th Cir. 1988). It follows that Plaintiff failed to show a violation of his clearly established constitutional right to an adequate investigation by Murphy or Workman, and this claim must be dismissed pursuant to Rule 12(b)(6) or on the basis of qualified immunity.

## IV. <u>CONCLUSION</u>

For the reasons set forth herein, Defendants Kevin Murphy and Jim Workman request that the Court grant their Motion to Dismiss and that Plaintiff's claims against them be dismissed with prejudice.

Dated: October 15, 2025.
 
**HALL BOOTH SMITH, P.C.**

**<u>/s/Christian J. Ferlan</u>**
Christian J. Ferlan
N.C. Bar No. 53459
11215 North Community House Road
Suite 750
Charlotte, NC 28277
Phone:   (980) 859-0380
Fax:       (678) 539-1601
E-mail:
*Attorneys for Defendants Kevin Murphy and Jim Workman*

25

## PAGE OR WORD COUNT CERTIFICATION

I, Christian Ferlan, hereby certify that the foregoing memorandum of law contains 7,894 words based on the word count generated by Microsoft Word and therefore complies with the requirements of Local Rule 7.2(f)(3).

Dated: October 15, 2025.                                             **/s/Christian J. Ferlan**